UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LESLIE ATKINS, individually and d/b/a
LESLIE ATKINS COMMUNICATIONS,

    Plaintiff,

      v.

BENSON J. FISCHER, *et al.*,

    Defendants.

Civil Action No. 98-800 (CKK)

**MEMORANDUM OPINION**
(August 29, 2005)

Plaintiff Leslie Atkins, d/b/a Leslie Atkins Communications, Inc., brought this action

against Defendants Benson J. Fischer, the Fischer Organization, Inc., and the Fischer Brewing

Company, Inc. (collectively, "Defendants"), alleging copyright infringement in the commercial

use of six-pack carrier and bottle designs for a product called "Redneck Beer" in violation of the

Copyright Act of 1973, 17 U.S.C. § 102, and Section 43(a) of the Lanham Act, 15 U.S.C. §

1125(a).  Currently before the Court is Plaintiff's Motion for Finding that Defendants and Their

Prior Counsel, Stanley Goldschmidt, Esquire, Attempted to Perpetrate a Fraud Against This

Court and For an Award of Appropriate Sanctions, the separate Oppositions filed by Defendants

and Mr. Goldschmidt, and Plaintiff's Combined Reply.  Also pending before the Court is Mr.

Goldschmidt's Motion for Sanctions Against Plaintiff for Violation of Federal Rule of Civil

Procedure 11, and Plaintiff's subsequent Opposition.

Upon a searching examination of the parties' respective filings, all attached exhibits, the

relevant case law, and the entire record herein, the Court shall grant-in-party and deny-in-part

Dockets.Justia.com

Plaintiff's motion and shall deny Mr. Goldschmidt's motion for sanctions.[1]  Given the present

posture of the case, the Court shall set a status conference in order to set out the scheduling

groundwork for the upcoming trial on the merits in the above-captioned action.

# I: BACKGROUND

A.      Procedural History

Plaintiff Leslie Atkins, d/b/a Leslie Atkins Communications, Inc., has for over twenty

years, offered clients a wide range of public relations, advertising, and marketing services.

Defendant Benson J. Fischer, an entrepreneur planning to produce a novelty beer,[2] dubbed

"Redneck Beer," hired Plaintiff during September of 1993 to design a bottle label and a six-pack

carrier for his anticipated beer.  Under the first stage of the relevant agreement, Plaintiff

delivered to Defendant Fischer a preliminary illustration of a beer bottle label featuring a blue

jean pocket and a red bandana.  The second phase of the agreement, which required Plaintiff to

produce the same label and carrier in "camera-ready" final form, was never completed, and the

agreement was terminated.  Between August 1995 and June 1996, Redneck Beer was proudly

---

[1] After briefing was completed vis-á-vis Plaintiff's Motion for Sanctions, Defendants then filed a Motion for Leave to File Affidavit in Support of Opposition to Motion for Sanctions, which Plaintiff opposed and filed a subsequent Motion to Strike.  Defendants then filed a combined Reply, and Plaintiff subsequently entered a Reply to Defendants' Opposition to her Motion to Strike.  Given the Court's decision on Plaintiff's underlying Motion for Sanctions, the Court shall deny Defendants' Motion for Leave to File Affidavit and Plaintiff's Motion to Strike as moot.

[2] The other Defendants identified in Plaintiff's Complaint are the Fischer Organization, which Defendant Fischer previously identified as his "real estate brokerage firm," and the Fischer Brewing Company, Inc., which was created in conjunction with the Redneck Beer product. Defendant Fischer explained that the Fischer Organization was "acting on behalf of the yet-to-be formed Fischer Brewing Company early in the relationship between the parties."  *See Atkins v. Fischer*, Civ. No. 98-800, at 1-2, n.1 (D.D.C. Nov. 30, 2001).

sold in fine stores in thirty-four (34) states across the United States using a bottle label and

carrier designed by a third-party which also featured a denim pocket and a red bandana.

Contending that the subsequent design infringed upon her copyrighted work, Plaintiff

filed her Complaint in this action in March 1998. After the close of discovery, pursuant to a

Memorandum Opinion and Order dated November 30, 2001, this Court denied Plaintiff's motion

for summary judgment and *sua sponte* granted summary judgment for Defendants. *See Atkins v.

Fischer*, Civ. No. 98-800, at 33-34 (D.D.C. Nov. 30, 2001) (order granting summary judgment to

Defendants). The Court concluded that (1) Defendants had an implied nonexclusive license to

use Plaintiff's work in the commercial production of Redneck Beer; and (2) the six-pack carrier

design actually used by Defendants in the sale of Redneck Beer was not substantially similar to

Plaintiff's preliminary designs. *Id.* In addition, the Court dismissed Plaintiff's Lanham Act

claim. *Id.* Upon appeal, the D.C. Circuit determined that (1) an issue of material fact existed as

to whether Defendants had an implied license to use Plaintiff's marketing design for production,

and (2) an issue of material fact also existed as to whether Plaintiff's marketing copy and the

actual production copy of the six-pack carrier were "substantially similar." *See Atkins v. Fischer*,

331 F.3d 988, 993-995 (D.C. Cir. 2003). Given these substantial issues of material fact, the D.C.

Circuit reversed this Court's November 30, 2001 ruling and remanded the case to this Court for

further consideration. *Id.* at 995.

While trial in this case appeared imminent after the decision by the Court of Appeals,

Defendants immediately filed a motion to stay litigation pending resolution of bankruptcy

proceedings. On November 18, 2003, this Court granted Defendants' motion to stay as it related

to Defendant Benson Fischer. On April 19, 2004, Defendants informed the Court that Defendant

Fischer had consented to relief from the automatic bankruptcy stay and that this case would now move forward.  On June 18, 2004, Plaintiff filed her current Motion for Sanctions.  The Court then held a status conference with the parties on June 30, 2004, wherein the Court was informed that this case could not proceed to trial until the Motion for Sanctions was resolved.  However, an expedient resolution of Plaintiff's motion was thwarted by Defendants' Motion for an Order Directing Plaintiff's Counsel to Allow Access to Discovery Documents -- a motion filed by Defendants' new counsel, who had determined that a "substantial amount of discovery related materials" were missing from the files handed over to them by Defendants' previous attorneys. *See* Defs.' Mot. for Order to Allow Access at 2.  Defendants sought to have Plaintiff provide them with access to her copies of the missing documents, which Defendants would then copy at their own expense; however, these requests were rebuffed by Plaintiff's counsel.  *Id.* at 3. Importantly, while Defendants acknowledged that the missing documents "are not of plaintiff's making," they stressed that they could not mount a proper defense of Plaintiff's Motion for Sanctions without the documents -- many of which could only be obtained from Plaintiff.  *Id.* at 4.

In order to resolve this dilemma, the Court issued a Memorandum Opinion and Order on August 17, 2004, which focused on the fact that "Defendants cannot respond to Plaintiff's motion, or defend themselves in a potential future trial, without the full record in this case." *Atkins v. Fischer*, Civ. No. 98-800, at 3 (D.D.C. Aug. 17, 2004) (order requiring Plaintiff's counsel to provide Defendants access to those documents Defendants could not obtain through any other source).  Noting the burden on Plaintiff -- whose "attorney works in a small office with few resources to handle Defendants' request" -- the Court ordered that "Defendants shall be

permitted access to Plaintiff's files to obtain only those documents that they do not have in their

own files and that cannot be obtained from other sources." *Id.* In return for this privilege, the

Court ordered "that Defendants be required to compensate Plaintiff's counsel not only for the

costs of copying documents, but also for the time that Plaintiff's counsel's representatives must

expend in order to locate and prepare the documents for Defendants." *Id.* at 4. Finally, the Court

directed that "Plaintiff shall estimate how much it will cost to complete this project and provide

this estimate to Defendant[s] prior to beginning work on the project. Plaintiff shall endeavor to

minimize the expense of this undertaking by utilizing low-level staff where possible." *Id.*

Despite the Court's even-handed, clear bargain, progress in this process immediately

broke down. Plaintiff filed a Motion for Clarification of the Court's Order on September 7,

2004, in which she announced that her counsel would copy all identified documents "*except* for

documents produced by the Fischer defendants themselves in this case -- almost all of which

Defendants now claim are 'missing,'" Pl.'s Mem. in Support of Her Mot. for Clarification at 2.

Plaintiff further asserted that Mr. Fischer (on behalf of Defendants), Mr. Stanley Goldschmit,

Esq., former counsel to Defendants, and Mr. Richard Schimel, Esq., successor counsel, must

each "file affidavits attesting that they do not have the Fischer and Fischer Companies'

documents that were supplied in discovery and after conducting a diligent search to include

agents and their representatives, they have been unable to locate the same." *Id.* at 1. Asserting

that Plaintiff was unilaterally altering this Court's August 17, 2004 Order and imposing

additional requirements, Defendants immediately objected to Plaintiff's actions and threatened a

motion for sanctions on their own. The Court was then forced to resolve this dispute through

another Memorandum Opinion and Order, dated December 1, 2004. In this Order, the Court

5

required

> that Plaintiff provide Defendants access to or copies of *all materials* requested by Defendants which are outlined in the Status Report filed on September 15, 2004. No affidavits are required from Defendant[s], though Defendant[s] [are] under a continuing ethical obligation to inform Plaintiff if any of these materials requested are actually within their possession. Plaintiff must give Defendants access to or copies of these materials by no later than Thursday, December 23, 2004, or [her] pending Motion for Finding that Defendants and Their Prior Counsel, Stanley Goldschmidt, Esquire, Attempted to Perpetrate a Fraud Against this Court and for Appropriate Sanctions will be denied by the Court. The previous scheme created by the Court's August 17, 2004, Opinion and Order, which provided compensation for Plaintiff's counsel and staff for preparing the documents and copying them, will remain in place.

*Atkins v. Fischer*, Civ. No. 98-800, at 13-14 (D.D.C. Dec. 1, 2004) (order denying Plaintiff's

Motion for Clarification) (emphasis in original).

The Court's December 1, 2004 Opinion and Order, which constituted a global resolution

of all pending production-related disputes, apparently had the intended impact, as separate Status

Reports filed by both Plaintiff and Defendants on January 6th and 7th, 2005, indicated that

Defendants were ultimately provided the necessary requested materials. The Court then entered

a briefing schedule to complete the briefing of Plaintiff's Motion for Sanctions; Defendants filed

their Opposition on February 7, 2005, while Plaintiff filed her Reply on February 21, 2005. At

the same time that the production-related disputes were reaching a simmering point in this case,

Defendants former counsel, Mr. Stanley H. Goldschmidt, Esq., filed a cross-motion for sanctions

against Plaintiff on August 31, 2004, and Plaintiff filed an Opposition to that motion on

September 13, 2004. The Court stayed consideration of that motion until it could resolve

Plaintiff's Motion for Sanctions concurrently. Given that Plaintiff's Motion for Sanctions is now

fully briefed, nearly one (1) year after it was initially filed, the Court can resolve both fully

briefed sanctions-related motions.

  *B.  Factual Context of the Sanctions-Based Motions*

  Plaintiff's Motion for Sanctions, now fully ripe, asserts that "there is compelling reason to believe that Plaintiff Benson Fischer ("Fischer") and his former attorney, Stanley Goldschmidt, Esq., attempted to perpetrate a fraud upon this Court by fabricating evidence and hiding material evidence during discovery which, among other things, would have precluded this Court's grant of summary judgment." Pl.'s Mot. for Sanctions at 1. According to Plaintiff, absent Defendants' fraud, "Plaintiff's appeal would have been unnecessary." *Id.* As such, Plaintiff contends that "[a]n award of appropriate sanctions to include entry of default judgment, an award of substantial attorneys' fees, and referral of Mr. Fischer's conduct to the United States Attorney's Office is in order." *Id.*

  Plaintiff's argument for the draconian sanction of default judgment rests upon four (4) major contentions.

    1.  <u>History of Misconduct in Contemporaneous, Related Litigations</u>

  First, Plaintiff cites to the "history of misconduct" by Mr. Fischer and his former attorney, Mr. Goldschmidt, "in other contemporaneous litigation." *Id.* at 4. Plaintiff points to two different cases, coetaneous to this case, in which Messrs. Fischer and Goldschmidt were sanctioned for misconduct: (1) *Fischer Brewing Co. v. Flax*, Superior Court of the District of Columbia, Civ. No. 678-97, *aff'd*, *Fischer v. Estate of Howard L. Flax*, 816 A.2d 1 (2003); and (2) *In re Fischer*, United States Bankruptcy Court of the District of Maryland, Case No. 03-13704-DK. *Id.* at 4, 9. The *Fischer v. Flax* litigation dealt with a breach of contract lawsuit by Mr. Fischer against (1) Mr. Howard Flax, who signed an agreement with Mr. Fischer providing

for a substantial finder's fee if Mr. Flax was able to locate financing for the Fischer Brewing

Company and Redneck Beer, and (2) the law firm representing Mr. Flax, Paley Rothman. *Id.* at

4-5. During the *Fischer v. Flax* litigation, Superior Court Judge Steffen W. Graae, after a bench

trial on the "bad faith litigation" counterclaim, sanctioned Mr. Fischer for almost $930,000.00 in

attorney's fees and costs for bad faith litigation and $40,000.00 in punitive damages. Pl.'s Reply

at 1-2. Judge Graae concluded that Mr. Fischer's suit "rests on false allegations, fraudulent

documentation, and a stubborn refusal to acknowledge wrongdoing, the suit represents the

grossest kind of abuse of the legal process." *Id.* at 2; Pl.'s Mot. for Sanctions, Ex. 3 (May 3,

2000 Opinion and Order) at 23. Specifically, Judge Graae found that "the evidence is clear and

convincing that Mr. Fischer knowingly constructed a fraudulent suit against Flax and [his]

lawyers," Pl.'s Mot. for Sanctions, Ex. 3 (May 3, 2000 Opinion and Order) at 21. Judge Graae

also focused on the fact that Mr. Fischer's actions "raise[d] questions about efforts he may have

made to manipulate witnesses and lawyers in this case," *id.* at 19-20. Finally, in his separate

award of punitive damages against Mr. Fischer, Judge Graae found that "[i]t is obvious that an

oath to tell the truth means little or nothing to Mr. Fischer and that he is still intent on

manipulating the legal process." Pl.'s Mot. for Sanctions, Ex. 5 (Dec. 18, 2000 Order and

Judgment).

     Judge Graae also awarded Rule 11 sanctions against Mr. Goldschmidt, who represented

Mr. Fischer in *Fischer v. Flax*, and his co-counsel, Mr. Arthur Kahn, Esq., in the sum of

$50,000.00. Pl.'s Mot. for Sanctions, Ex. 6 (Dec. 2, 2003 Opinion and Order). Judge Graae

concluded that Mr. "Goldschmidt and Mr. Kahn served as nothing more than mouthpieces for the

threats Mr. Fischer made . . . . Goldschmidt's and Mr. Kahn's pleadings may have satisfied Mr.

8

Fischer's thirst for vengeance, but they did not meet the legal or factual standards contemplated by Rule 11." *Id.* at 11. Judge Graae went on to find that "the Court considers the professional conduct of Goldschmidt and Mr. Kahn to be well beyond the pale. These two experienced lawyers knew, or had to know, they did not have sufficient evidence to make a case for tortious interference by Mr. Mark and his law firm, Paley Rothman. . . . The Court can only characterize their conduct as willful and badly motivated." *Id.* at 13-14. Plaintiff, in addition to focusing on Judge Graae's sanctioning of Mr. Goldschmidt in *Fischer v. Flax*, also focuses on the fact that Mr. Goldschmidt -- in attempting to defend himself in that action -- claimed that he suffered from "a state of mental intoxication and loss of impulse control and judgment," Pl.'s Mot. for Sanctions, Ex. 7 (Statement from Mr. Goldschmidt's medical doctor), due to "clinical depression and drug induced intoxication," Pl.'s Mot. for Sanctions at 7. Plaintiff emphasizes that "[i]t is of interest that Goldschmidt claims that he suffered from clinical depression and drug induced intoxication through the Fischer litigation--which was also the period of time that the instant litigation was pending before this Court." *Id.* at 8. Plaintiff further stresses that Mr. Goldschmidt, along with Mr. Fischer, was sanctioned once again for another $30,000.00 after being found in contempt by the Circuit Court for Montgomery County, Maryland, for stonewalling collection-related discovery during post-judgment collection efforts instigated by Paley Rothman. Pl.'s Mot. for Sanctions at 11-12; Pl.'s Reply at 3.

Following collection efforts, Mr. Fischer filed for personal bankruptcy pursuant to Chapter 7 of the Bankruptcy Code. *See In re Fischer*, United States Bankruptcy Court for the District of Maryland, Case No. 03-13704-DK. Plaintiff contends that in his bankruptcy case, Mr. "Fischer has engaged in the same pattern of behavior that he displayed in the *Fischer v. Flax*

9

litigation" by refusing "to appear for depositions when ordered" and presenting "evidence in the Bankruptcy Court which he likely fabricated after the fact." Pl.'s Mot. for Sanctions at 9. For instance, in an Order dated March 12, 2004, Bankruptcy Judge Keir granted sanctions to Plaintiff, a creditor in Mr. Fischer's bankruptcy case, for Mr. Fischer's refusal to comply with a Court order directing a FRBP 2004 examination; Judge Keir's Order also provided for sanctions against Mr. Fischer's bankruptcy attorney, Mr. Richard Rosenblatt. *See* Pl.'s Mot. for Sanctions, Ex. 12 (3/10/04 Tr. of Bankruptcy Court Hearing).

Plaintiff contends that the conduct of Messrs. Fischer and Goldschmidt in litigation contemporaneous to this case must be considered relevant by this Court in the resolution of Plaintiff's present Motion for Sanctions. Essentially, Plaintiff argues that Mr. Fischer and his lawyers, including former counsel Mr. Goldschmidt, have exhibited a pattern of misconduct that "constitutes chronic abuse of the legal standard." Pl.'s Reply at 10. Plaintiff describes the behavior by Defendants and their counsel as "extraordinary by any standard" wherein "fabricating documents, lying under oath, and using the legal system to further personal vendettas is Fischer['s] *modus operandi*." Pl.'s Mot. for Sanctions at 12. Plaintiff posits that it would "blink[] reality for this Court to ignore the extreme misconduct," Pl.'s Reply at 8, as it is quite likely that Mr. Fischer and Mr. Goldschmidt exhibited a similar pattern of behavior in this case.

2.     Withholding of Discovery in This Case

Second, Plaintiff cites to the alleged discovery abuses by Defendants and their former counsel, Mr. Goldschmidt, in suppressing material evidence in this case. Pl.'s Mot. for Sanctions at 13; Pl.'s Reply at 11. Plaintiff focuses on three (3) alleged instances of suppression of key evidence: (1) the production of false gross revenues incurred during the sale of Redneck Beer,

which significantly underestimate the total sales of Redneck Beer, Pl.'s Mot. for Sanctions at 13 & n.10; (2) the apparent withholding by Mr. Fischer and Mr. Goldschmidt of documents showing that the Atkins' Logo was used in t-shirts produced and sold under license and the actual samples of the t-shirts themselves, *id.* at 13-20; and (3) the intentional suppression of the "missing" documents in this case, subject to this Court's discovery-related production orders requiring Plaintiff to share certain documents with Defendants' new counsel, Pl.'s Reply at 11-13.

Plaintiff alleges that income tax-related documents produced by Defendants in this case stated that from 1995 through 1996 (the period during which the Fischer Brewing Company sold Redneck Beer), total sales amounted to roughly $1.5 million. Pl.'s Mot. for Sanctions at 13. However, Plaintiff points to two different *Washington Post* articles which apparently contradict this figure. *Id.* at 13, n.10. In the first article, Plaintiff asserts that Mr. Fischer claims that over 375,000 cases of Redneck Beer were sold; at $9.05 per case, Plaintiff estimates that such sales would have produced revenues of $3.4 million. In the second article, it is reported that Fischer Brewing "sold almost 15 million bottles" of Redneck Beer; Plaintiff estimates that at $9.05 per case, gross revenues would have been approximately $5.7 million. *Id.* As such, Plaintiff implies that Mr. Fischer and his former counsel, Mr. Goldschmidt, must be hiding the true revenues related to Redneck Beer. *Id.*

However, Plaintiff spends most of her argument on the allegation that Mr. Fischer and Mr. Goldschmidt withheld key evidence that Atkins' Logo was used in t-shirts produced and sold under license pursuant to a November 15, 1995 agreement between the Fischer Brewing Company and Cambridge Sportswear, Inc. *Id.* at 13-20. In this agreement, Cambridge Sportswear provided the Fischer Brewing Company a $100,000.00 initial royalty fee in order to

11

possess the exclusive license to produce Redneck Beer-branded clothing and wearing apparel. *Id.* at 14. According to Plaintiff, during Plaintiff's examination of Mr. Fischer in the *In re Fischer* bankruptcy case, Mr. Fischer maintained that this contract was "to license the name Redneck beer. Specifically the name, nothing else." *Id.* at 14 (citing 1/19/04 Fischer Dep. at 41). Indeed, Plaintiff contends that "[a]t no time did Fischer or Goldschmidt ever produce T-shirts or other clothing made by Cambridge under license in discovery in this case." *Id.* However, in the *Fischer v. Flax* litigation, Mr. Fischer produced a copy of a business plan which had been Bates stamped LFB000369-LFB000579. *Id.* at 16. Unlike the business plan produced in *Flax*, the business plan produced by Defendants in this case "lacked the Cambridge T-shirt photographs confirming Cambridge's reproduction on the T-shirts of the Atkins logo. Also lacking were photos of a model with Redneck beer, a promotional photo which included and made use of the Atkins Logos." *Id.* at 17. Plaintiff contends the omissions from the business plan were deliberate, despite the protestations of Mr. Fischer and Mr. Goldschmidt, because such information would have precluded this Court's November 30, 2001 grant of summary judgment under an implied non-exclusive license theory. *Id.* at 17-18. Specifically, according to Plaintiff,

> Fischer's licensing to Cambridge Sportswear of Redneck Beer trademarked goods, *including the Atkins Logos* for use on wearing apparel would not be within any implied nonexclusive license to use the Atkins Logos for commercial production and distribution of beer. And, under no circumstances could Fischer grant an *exclusive* license to Cambridge. An implied license (which is all that Fischer could have had), at best, is *nonexclusive*. Fischer could not grant an exclusive license that he himself did not have.

*Id.* at 18 (emphasis in original). As such, given the importance of this complete business plan and "the remarkable history of prevarication" laid out by Plaintiff, Plaintiff asserts that "Fischer and Goldschmidt cannot be heard to say that the failure to produce key documents (and apparel

samples) that were clearly in their possession was a simple oversight." *Id.* at 20.

Finally, Plaintiff argues that Mr. Fischer and Mr. Goldschmidt are continuing to hide documents related to this litigation. Pl.'s Reply at 11-13. Specifically, Plaintiff contends that it is the practice of Messrs. Fischer and Goldschmidt "to claim that they do not have documents and to not produce documents," *id.* at 11, and that practice has exhibited itself with respect to the very documents subject to this Court's production-related orders of August 17, 2004 and December 1, 2004. According to Plaintiff, in a hearing held before the Bankruptcy Court on October 20, 2004, Mr. Fischer stated to the court that Mr. Goldschmidt retains one hundred (100) to two hundred (200) boxes of his business files, and indicated through counsel that he has tried unsuccessfully to obtain the documents from Mr. Goldschmidt. *Id.* at 12 (citing Pl.'s Reply, Ex. B (Oct. 20, 2004 Bankruptcy Court Tr. at 70-71). Plaintiff speculates that these boxes contain even more material than was copied by Defendants' successor counsel in this case from Plaintiff's files pursuant to the Court's Orders, and suggests that Mr. Goldschmidt -- who has been held in contempt in Montgomery County, Maryland, for failing to produce documents -- has failed to produce these documents in order to cover up his own misconduct. *Id.* at 11-12 & n.15. Plaintiff concludes by stating that "[w]e have absolutely no doubt that the allegedly missing Fischer documents can be found (or recreated from) the 200 boxes and that Messrs. Fischer and Goldschmidt have, yet again, played games with this Court and with everyone else in this case." *Id.* at 13.

3.    Fischer's Alleged Fabrication of a Fake Mock-Up Bottle

Third, Plaintiff asserts that evidence has come to light that indicates Mr. Fischer fabricated a mock-up, or prototype, bottle of Redneck Beer featuring the original concept of a red

bandana and denim pocket in an attempt to support his claims that he -- and not Plaintiff -- is entitled to the copyright of the relevant design. Pl.'s Mot. for Sanctions at 20. During the earlier round of dispositive motions, Defendants had alleged that Mr. Fischer, prior to meeting Plaintiff, had constructed a mock-up Redneck Beer bottle, using a Budweiser beer bottle, in order to demonstrate his concept of how the ultimate design should look; Defendants also argued that Mr. Fischer had also created some preliminary sketches highlighting his design ideas. *See Atkins v. Fischer*, Civ. No. 98-800, at 11-12 (D.D.C. Nov. 30, 2001). The Court rejected Defendants' argument, given Mr. Fischer's vague and inconclusive testimony regarding whether he actually showed Plaintiff the alleged mock-up bottle and sketches, and given the unequivocal testimony by both Plaintiff and Mr. Thomas Gaadt (the artist hired by Plaintiff to sketch the Atkins designs) that they never saw the mock-up bottle. *Id.*

Despite the fact that the Court rejected Defendants' mock-up bottle claim as a matter of law, Plaintiff continues to focus on the importance of the mock-up bottle -- which has long been the subject of major discovery disputes. Essentially, Plaintiff maintains that the mock-up bottle was created after the fact by Mr. Fischer in order to evade Plaintiff's claims. To support this argument, Plaintiff contends: (1) contrary to Mr. Fischer's deposition testimony, *see* 4/3/00 Fischer Dep. at 388, the mock-up bottle -- as confirmed by Anheuser Busch Company through an analysis of a picture of the mock-up bottle -- was not a Budweiser beer bottle at all, as the mock-up bottle was of a clear color, *see* Pl.'s Mot. for Sanctions at 23-24 (citing 7/28/00 Dep. of Mark Elliott, Senior Manager in the Packaging Technology Group for Anheuser Busch); (2) the refusal by Plaintiff's former counsel, Mr. Goldschmidt, to hand over the actual bottle for further testing leads to an inference that Defendants were aware that the bottle was created *ex post facto*, and

14

sought to hide that fact, *id.* at 24-25; (3) virtually all testimony in this case indicates that no one was shown the mock-up bottle by Mr. Fischer, contrary to his assertions, *id.* at 22 (citing to the fact that only Mr. Harvey Berkman and Mr. Steve Solomon testfied that they ever saw the mock-up bottle, and arguing that their testimony was vague), Pl.'s Reply at 25-28; and (4) Plaintiff's review of standard bottle markings in the United States, assisted by an expert witness with experience in the glass industry (Mr. C. Phillip Ross), indicates that the numbers engrossed on the mock-up bottle -- "96 and a symbol that looks like a B and then the number 9934 and then the number 2," Pl.'s Reply at 29 -- has led her to "believe that the symbol '96' on the mock-up bottle refers to the year of manufacture of that bottle," *id.*, ensuring that the mock-up was created long after Mr. Fischer held discussions with Plaintiff regarding design plans.

Plaintiff contends that the "fabricated" mock-up bottle had a significant impact on this litigation. According to Plaintiff, "[t]he vast majority of discovery conducted by the Plaintiff from 1999 until 2001 was the result of the concocted Mock-up Bottle defense." Pl.'s Mot. for Sanctions at 26. Moreover, Mr. "Fischer's lies and fabrication converted a straightforward copyright infringement case into a case where a major issue in discovery was whose copyright it is." *Id.* Plaintiff avers that this kind of behavior by Mr. Fischer is similar to his actions taken in the *Fischer v. Flax* litigation, and that default judgment is the required sanction for such malfeasance. *Id.*; Pl.'s Reply at 30.

### 4. Defendants' Counterclaims Were Filed in Bad Faith and Without a Legal or Factual Basis

Fourth, and finally, similar to the *Fischer v. Flax* litigation, wherein Judge Graae expressly found that Mr. Fischer's claims against Mr. Flax were without legal or factual basis or

15

proper investigation, Plaintiff contends that Defendants' counterclaims in this case were filed

without legal or factual basis.  *See* Pl.'s Mot. for Sanctions at 26-27.  Defendants filed four (4)

counterclaims in this case:  (1) breach of contract; (2) tortious interference with business

relations; (3) infringement of trademark; and (4) infringement of the trademark.  *See generally*

Defs.' Ans.  Defendants' counterclaims were filed over seven years ago and Plaintiff's previous

counsel never filed a Motion for Rule 11 Sanctions at that time.  After Defendants' filed their

counterclaims, Plaintiff brought a Motion to Dismiss those claims; this Court granted Plaintiff's

motion as to Counterclaim I (breach of contract), but denied the motion as to the remaining

counterclaims.  The remaining three (3) counterclaims were ultimately dismissed by Defendants'

stipulation on September 26, 2000.  Despite these facts, Plaintiff maintains that "[t]he

counterclaims were utterly lacking in specific detail," Pl.'s Mot. for Sanctions at 27, that they

were without any factual basis, *id.* at 29, and that they were filed simply to "prolong[] the

litigation and mak[e] it much more costly than it needed to be," *id.* at 31.

In sum, Plaintiff notes that "[t]he point of all of this is to demonstrate to the Court that

Fischer (and his former counsel, Goldschmidt), on an ongoing basis made false and fraudulent

assertions, have acted in reckless disregard of the truth and/or have used litigation as a weapon."

*Id.* at 33.  According to Plaintiff, "[c]ourts need to take firm action with litigants such as this.

Our rule of law cannot function if the Fischers and Goldschmidts of this world are permitted to

do whatever they want."  *Id.*  As such, Plaintiff argues that Defendants' misconduct calls for

default judgment, as well as "an appropriate award of actual and punitive damages in an amount

sufficient to deter [Mr. Fischer] and others similarly situated from attempt[ing] to perpetrate this

kind of fraud."  *Id.* at 39.  Moreover, Plaintiff suggests that a referral of this matter to the United

States Attorney's Office for review and/or initiation of criminal contempt proceedings is appropriate. *Id.* at 39-40.

In response, Defendants' former counsel, Mr. Stanley H. Goldschmidt, Esq., has brought a Motion for Rule 11 Sanctions against Plaintiff and her counsel. *See* Goldschmidt's Mot. for Sanctions at 1-2. Mr. Goldschmidt's curt motion simply refers to the applicable Rule 11 standards and then references his Opposition to Plaintiff's Motion for Sanctions. *Id.* Mr. Goldschmidt's Opposition essentially accuses Plaintiff's counsel, Mr. Carlos M. Recio, of filing Plaintiff's Motion for Sanctions with distortions, half-truths, and outright lies to such an extent that "Mr. Recio has overstepped the boundaries of his immunity." Goldschmidt's Opp'n at 13. According to Mr. Goldschmidt, "[t]he Motion filed by Mr. Recio represents lawyering at its worst. Not only is there not an ounce of substance, civility or refinement contained in the Motion, but Mr. Recio totally misleads this Court, by failing to include appropriate exhibits and withholding other information, which would have mandated against his filing of the Motion." *Id.* at 12. Mr. Goldschmidt further objects to Plaintiff's use of Goldschmidt's "encountered difficulties in another case" and Plaintiff's use of his recent medical troubles to portray him "as a psychotic basket case with a drug addiction." *Id.* As such, Mr. Goldschmidt requests that this Court not only reject Plaintiff's motion, but impose the requisite sanctions to thwart the "prevarications" of Plaintiff's counsel. *Id.*

## II: LEGAL STANDARDS

Plaintiff requests that the Court sanction Defendants and their former counsel, Mr. Stanley H. Goldschmidt, Esq., pursuant to the "numerous overlapping sources of this Court's sanction's authority: the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and this Court's

inherent authority." Pl.'s Mot. for Sanctions at 33. Plaintiff contends that "because of the attempted perpetration of fraud on this Court," "judgment by default should be entered" in favor of Plaintiff "and attorney's fees awarded." *Id.* at 34. While Defendants simply attempt to refute Plaintiff's allegations in their filing, Mr. Goldschmidt has brought his own Motion for Sanctions against Plaintiff pursuant to Federal Rule of Civil Procedure 11(b). *See* Goldschmidt's Mot. for Sanctions at 1-2; Goldschmidt's Opp'n at 12-13. As such, before the Court can discuss the content of the cross-motions for sanctions, the Court first must set out the relevant legal standards underlying the Court's ability to sanction a litigant or counsel in an action.

     *A.      Rule 11*

     Rule 11 of the Federal Rules of Civil Procedure provides that all pleadings, motions or other papers filed with the Court shall be signed by an attorney. Fed. R. Civ. P. 11. The signature affixed pursuant to Rule 11 certifies that the pleading or motion "is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation," that "the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law," and that "the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." *Id.* Where a pleading or motion is signed in violation of the Rule, the court may sanction the party or signatory attorney appropriately. *Id.*

     The "central purpose of Rule 11 is to deter baseless filings in district court and thus . . . streamline the administration and procedure of the federal courts." *Cooter & Gell v. Hartmarx*

*Corp.*, 496 U.S. 384, 393, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).  Since the 1993 amendments,

the language of Rule 11 indicates that the imposition of sanctions is left to the discretion of the

district court judge.  *See Rafferty v. Nynex Corp.*, 60 F.3d 844, 852 n.12 (D.C. Cir. 1995); Fed. R.

Civ. P. 11(c) (noting that when the rule has been violated, a court *may* impose an appropriate

sanction); *see also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*

§ 1336 (2d ed. Supp. 2000) (commenting that the scope of the Advisory Committee's list of

factors to consider when deciding whether or not to impose a sanction suggests that "the district

court is given the widest possible latitude under the new" version of Rule 11).  As possible

sanctions pursuant to Rule 11, the court has an arsenal of options at its disposal, "such as striking

the offending paper; issuing an admonition, reprimand, or censure; requiring participation in

seminars or other educational programs; ordering a fine payable to the court; [or] referring the

matter to disciplinary authorities."  *See* Fed. R. Civ. P. 11 advisory committee's note (1993).

       *B.*     *Rule 37(b)(2)*

       Rule 37(b)(2) of the Federal Rules of Civil Procedure permits a court to issue such orders

"as are just" to sanction a party who fails to obey an order to provide or permit discovery,

including a discovery order under Rule 26, governing discovery generally, and Rule 35,

governing orders for independent physical or mental examinations.  *See* Fed. R. Civ. P. 37(b)(1).

Such sanctions may include taking certain facts as established, prohibiting the introduction of

certain evidence, striking pleadings or parts thereof, staying further proceedings until the order is

obeyed, or dismissing the action or proceeding or any part thereof and/or rendering a judgment

by default against the disobedient party.  *See* Fed. R. Civ. P. 37(b)(2); *Bonds v. Dist. of*

*Columbia*, 93 F.3d 801, 807-08 (D.C. Cir. 1996), *cert. denied*, 520 U.S. 1274, 117 S.Ct. 2453,

138 L.Ed.2d 211 (1997); *Shepherd v. Am. Broadcasting Cos.*, 62 F.3d 1469, 1474 (D.C. Cir. 1995).  The possible sanctions set out in Rule 37(b)(2) are not mutually exclusive; the court may impose several of the specified sanctions at the same time.  *See* 8A Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, *Federal Practice and Procedure* §§ 2284, 2289 (2d. ed. 1994). The imposition of the number and type of sanctions employed under Rule 37(b)(2) is left to the discretion of the trial judge.  *See id.* § 2284 ("With a rule as flexible as Rule 37, inevitably a broad discretion must be given the trial judge with regard to sanctions.").

However, the Court is limited in its ability to sanction parties pursuant to Federal Rule of Civil Procedure 37(b)(2).  The D.C. Circuit has held that "'[a] production order is generally needed to trigger Rule 37(b).'"  *Shepherd*, 62 F.3d at 147 (quoting *Attn'y Gen. v. The Irish People, Inc.*, 684 F.2d 928, 951 n.129 (D.C. Cir. 1982), *cert. denied*, 459 U.S. 1172, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983)); *see also* Jamie S. Gorelick, Stephen Marzen & Lawrence Solum, *Destruction of Evidence* § 3.4, at 74 & n.23 (1989 & Supp. 1995) ("[f]ederal court decisions . . . unanimously agree that sanctions pursuant to Rule 37 may not be awarded absent violation of a court order").  As such, in order to sanction a party pursuant to Rule 37(b)(2), the Court must identify a specific discovery order that was actually violated.

C.     *28 U.S.C. § 1927*

The court may also impose sanctions pursuant to 28 U.S.C. § 1927.  The statute provides that:

> [a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. The purpose of Section 1927 is to allow the Court "to assess attorney's fees against an attorney who frustrates the progress of judicial proceedings." *United States v. Wallace*, 964 F.2d 1214, 1218 (D.C. Cir. 1992). Before imposing sanctions on an attorney, the court must evaluate whether the attorney's conduct was "*at least* reckless[.]" *Id.* at 1217. "[U]nintended, inadvertent, and negligent acts[, however] will not support an imposition of sanctions under section 1927." *Id.* at 1219 (quoting *Cruz v. Savage*, 896 F.2d 626, 631 (1st Cir. 1990)).

For an action to be considered reckless misconduct, there must be a "'conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man.'" *Id.* at 1220 (quoting Restatement (Second) of Torts § 500 cmt. g (1964)). A showing by the moving party that the counsel in question acted recklessly or deliberately "in the face of a known risk" is required. *Healey v. Labgold*, 231 F. Supp. 2d 64, 68 (D.D.C. 2002) (citing *Wallace*, 964 F.2d at 1219). Once the moving party has met its burden, the court may then award sanctions under 28 U.S.C. § 1927. A variety of courts have noted, however, that "[t]he power to assess costs against an attorney under § 1927 . . . is a power that must strictly be construed and utilized only in instances evidencing a 'serious and standard disregard for the orderly process of justice.'" *Dreiling v. Peugeot Motors of Am., Inc.*, 768 F.2d 1159, 1165 (10th Cir. 1985) (quoting *Keitel v. Las Vegas Hacienda, Inc.*, 404 F.2d 1163, 1167 (7th Cir. 1968) and citing *United States v. Ross*, 535 F.2d 346, 349 (6th Cir. 1976)).

D. *The Court's Inherent Power*

When the Federal Rules of Civil Procedure do not provide courts with sufficient authority

to protect the integrity of the judicial system and prevent abuses of the judicial process, courts have the inherent power to impose sanctions for abusive litigation practices undertaken in bad faith.  *See Shepherd*, 62 F.3d at 1472; *Young v. Office of the U.S. Senate Sergeant at Arms*, 217 F.R.D. 61, 65 (D.D.C. 2003).  "These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'"  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)).  However, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion."  *Id.* at 44, 111 S.Ct. 2123 (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980)).

"The inherent power encompasses the power to sanction attorney or party misconduct, and includes the power to enter a default judgment."  *Shepherd*, 62 F.3d at 1475 (citations omitted).  Pursuant to the Court's inherent power, the Court may also enter a variety of sanctions, including fines, awards of attorneys' fees and expenses, contempt citations, disqualifications or suspensions of counsel, and drawing adverse evidentiary inferences or precluding the admission of evidence.  *Id.* (citing Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse* § 28(A) (2d ed. 1994)).

      E.     *Imposition of a Default or Dismissal as a Sanction for Misconduct*

While the Court does possess the power to dismiss a plaintiff's complaint or enter default judgment against a defendant as a sanction for previous malfeasance, default judgment -- the central request of Plaintiff's present motion -- is a very severe sanction that is contrary to the "judicial system's strong presumption in favor of adjudications on the merits."  *Shepherd*, 62

F.3d at 1475.  Default judgment is a "drastic step, normally to be taken only after unfruitful resort

to lesser sanctions."  *Id.* at 1478 (citations omitted).  Moreover, the sins of an attorney should not

be visited upon an innocent client.  *See Shea v. Donohoe Constr. Co.*, 795 F.2d 1071, 1077-78

(D.C. Cir. 1986).  Indeed, where "the client's only fault is his poor choice of counsel," default

judgment is a "disproportionate sanction" and an attempt should first be made to sanction the

attorney.  *Id.* at 1077.

Importantly, a district court may use its power to enter a sanction as severe as dismissal or

default judgment only if it finds, first, that there is clear and convincing evidence that the

fraudulent or bad faith misconduct actually occurred, and second, that a lesser sanction "would

not sufficiently punish and deter the abusive conduct while allowing a full and fair trial on the

merits."  *Shepherd*, 62 F.3d at 1472 (default judgment reversed because the district court failed to

make these two findings); *Young*, 217 F.R.D. at 65.  Moreover, a "district court must not only

find the misconduct by clear and convincing evidence, but must also provide a specific, reasoned

explanation for rejecting lesser sanctions."  *Id.* at 1480; *cf. Outley v. City of New York*, 837 F.2d

587, 591 (2d Cir. 1988) ("Before the extreme sanction of preclusion may be used by the district

court, a judge should inquire more fully into the actual difficulties which the violation causes,

and must consider less drastic responses.").

The D.C. Circuit has provided further guidance on the limits of the sanction of dismissal

or default judgment by articulating three (3) possible -- although not mandatory -- justifications

for dismissal as a sanction for misconduct, regardless of whether the court bases its decision on

the Federal Rules of Civil Procedure or its inherent power.  *See Webb v. Dist. of Columbia*, 146

F.3d 964, 971 (D.C. Cir. 1998).  Under *Webb*, such sanctions are justified when:  (1) the other

party has been "so prejudiced by the misconduct that it would be unfair to require [the party] to proceed further in the case"; (2) the party's misconduct has put "an intolerable burden" on the court by requiring the court to modify its own docket and operations in order to accommodate the delay; or (3) the court finds it necessary "to sanction conduct that is disrespectful to the court and to deter similar misconduct in the future." *Id.*; *see also Butera v. Dist. of Columbia*, 235 F.3d 637, 661 (D.C. Cir. 2001). "A sanction pursuant to any of these considerations must be based upon findings supported by the record." *Id.* (citing *Bonds*, 93 F.3d at 809). Given these stringent standards, it is clear that "default judgment must be a 'sanction of last resort.'" *Id.* (quoting *Shea*, 795 F.2d at 1075).

### III: DISCUSSION

The Court shall begin its examination of the pending motions by first analyzing Plaintiff's Motion for Sanctions against Defendants and their former attorney, Mr. Stanley H. Goldschmidt, Esq.; the Court will then scrutinize the contentions in Mr. Goldschmidt's Rule 11 Motion for Sanctions against Plaintiff.

A.      *Plaintiff's Motion for Sanctions Against Defendants and Mr. Goldschmidt*

As noted previously, *supra* Section I(B)(1)-(4), Plaintiff asserts that default judgment against Defendants, and additional sanctions against Defendants and their former attorney in this litigation, Mr. Goldschmidt, are warranted due to four (4) important considerations:  (1) the history of misconduct exhibited by Defendants and Mr. Goldschmidt as their counsel in separate litigations contemporaneous to this case; (2) the illegitimate withholding of discovery in the present case by Defendants and their counsel; (3) Defendant Fischer's alleged fabrication of the mock-up bottle of Redneck Beer, which constituted a fraud on this court, delayed discovery, and

24

compelled this Court to erroneously grant Defendants' motion for summary judgment under an implied license theory; and (4) the fact that Defendants' counterclaims filed in this case were without legal or factual basis. The Court shall review each of Plaintiff's contentions in turn.

### 1.    History of Misconduct in Separate, Contemporaneous Litigations

As detailed by the Court in the Background section of this Memorandum Opinion, Plaintiff's Motion for Sanctions and Plaintiff's Reply are replete with references to the misconduct -- both proven and alleged -- of Defendants and their former counsel, Mr. Goldschmidt, in two separate litigations that occurred contemporaneous with the first phase of this action: (1) *Fischer Brewing Co. v. Flax*, Superior Court of the District of Columbia, Civ. No. 678-97, *aff'd*, *Fischer v. Estate of Howard L. Flax*, 816 A.2d 1 (2003); and (2) *In re Fischer*, United States Bankruptcy Court of the District of Maryland, Case No. 03-13704-DK. *See* Pl.'s Mot. for Sanctions at 4, 9. Essentially, Plaintiff contends that the misconduct by Defendants and their counsel in previous litigations is particularly relevant to the present Motion for Sanctions, as it highlights the pattern and practice -- or *modus operandi* -- of Defendants and Mr. Goldschmidt in that they intentionally raise groundless claims, stonewall legitimate discovery requests, evade court orders, harass their opponents, and exhibit no regard for honest practice under the Federal Rules. *See, e.g.*, *id.* at 4-12; Pl.'s Reply at 1-10.

It has long been held that in considering the implementation of sanctions against a party or a counsel to a litigation, a district court may consider all the circumstances surrounding the alleged violation. *See Link*, 370 U.S. at 635, 82 S.Ct. 1386. "The totality of circumstances can include events which did not occur in the case proper but occurred in other cases and are, by their nature, relevant to the pending controversy." *Thibeault v. Square D Co.*, 960 F.2d 239, 246 (1st

Cir. 1992) (citing *Moody v. Miller*, 864 F.2d 1178, 1181 (5th Cir. 1989) (per curium) (in imposing sanctions, district court could properly consider plaintiff's "past history with the federal courts")); *see also Johnson v. Comm'r of Internal Revenue*, 289 F.3d 452, 456-57 (7th Cir. 2002) (Posner, J.) ("The Tax Court was not required to ignore [the attorney's] bad conduct in other cases; indeed, it would have been remiss not to consider it.") (citing cases); *Hissom v. New York City Dep't of Housing*, Civ. No. 86-2340, 1987 WL 45807, at *7 (S.D.N.Y. Dec. 22, 1987) ("in order to further the purpose of deterrence, the court should take into account whether the persons subject to sanctions have abused the judicial system in the past").  In making a sanctions determination, "a court should consider whether the attorney's conduct was repetitious as opposed to isolated, willful as opposed to negligent, and whether the attorney has a history of similar conduct in other cases."  *MAI Photo News Agency, Inc. v. Am. Broadcasting Co.*, Civ. No. 97-8908, 2001 U.S. Dist. LEXIS 1680, at *19-*20 (S.D.N.Y. Feb. 22, 2001).  Importantly, even "dogged good-faith persistence in bad conduct becomes sanctionable once an attorney learns or should have learned that it is sanctionable."  *Johnson*, 289 F.3d at 457 (citations omitted).

Defendants and their former counsel, Mr. Goldschmidt, attempt to convince the Court to ignore Plaintiff's recitations of their prior misdeeds for two (2) key reasons.  First, they claim that Plaintiff's "recital of these matters contains a myriad of inaccuracies, misrepresentations and half truths and misuses discrete facts out of context."  Defs.' Opp'n at 2; *see also* Goldschmidt Opp'n at 12 (contending that Plaintiff's citations "were obviously interposed by Mr. Recio in an attempt to 'poison the well' with the Court since . . . his arguments with respect to the 'substance' of his Motion are replete with falsehoods, and Mr. Recio apparently believed these issues could provide

26

him with 'cover' to camouflage his prevarications").  However, neither Defendants nor Mr.

Goldschmidt detail precisely which of Plaintiff's laundry list of past violations in other cases are

"unsubstantiated accusations," and neither party offers any explanation for the findings of

previous courts in regard to their behavior.  *See* Defs.' Opp'n at 1-2; Goldschmidt Opp'n at 11-

12.  Second, Defendants and Mr. Goldschmidt both claim that the matters raised by Plaintiff "are

extraneous and irrelevant to the issues at hand."  Goldschmidt Opp'n at 12; *see also* Defs.' Opp'n

at 2 ("More important, the <u>Flax</u> and <u>Fischer</u> bankruptcy cases are unrelated to the instant

litigation, have no bearing on the instant case and would be inadmissible as evidence." (citing

*Lanham v. Whitfield*, 805 F.2d 970, 972 (11th Cir. 1986) (affirming trial court's barring of

evidence of other litigation involving defendant on grounds that it would cause substantial

prejudice))).

However, the assertion by Defendants and Mr. Goldschmidt that previous sanctions and

misconduct in related cases are entirely irrelevant is not only undermined by the great weight of

case law, but also by the Federal Rules of Civil Procedure themselves.  For instance, the 1993

Advisory Committee Notes to Rule 11 provide that:

> *Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event*; whether it infected the entire pleading, or only one particular count or defense; *whether the person has engaged in similar conduct in other litigation*; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible party is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants: all of these may in a particular case be proper considerations.

Fed. R. Civ. P. 11 advisory committee's note (1993) (emphasis added).  Accordingly, a court is

certainly free to consider the conduct of a party or counsel in another litigation when examining

possible sanctionable activity in the instant action.

However, contrary to the extraordinary emphasis placed on the prior misconduct of Defendants' and Mr. Goldschmidt in other contemporaneous cases by Plaintiff, the usefulness of prior misconduct outside the present litigation is limited.  As the First Circuit noted:

> We emphasize that this is but one of many factors to be considered in passing upon the question of sanctions.  We also note that, in the case at hand, there is nothing to indicate that the judge's decision to preclude the evidence turned on this point.  Indeed, wholly apart from counsel's track record, preclusion was a supportable remedy for late supplementation on the record before the district court.

*Thibeault*, 960 F.2d at 246 n.6.  As such, the Court shall not consider Defendants' and Mr. Goldschmidt's history of misconduct, borne out in numerous sanctions-related decisions across many courts, as solely determinative of its decision in this case.  Simply, Plaintiff must prove that Defendants and Mr. Goldschmidt contravened this Court's Orders, the Federal Rules, and acknowledged standards of practice *in this case* in order to support her Motion for Sanctions. The established history of misconduct in contemporaneous litigation shall influence the Court in two respects, however:  (1) the Court shall analyze the conduct of Defendants and Mr. Goldschmidt with additional, more searching scrutiny, and compare their explanations against the evidence in this fulsome record; and (2) should the Court conclude that Defendants and Mr. Goldschmidt have violated established norms of practice to a sanctionable degree, their past pattern of misconduct shall influence the type and extent of sanctions ordered.

    2.    <u>Alleged Withholding of Discovery in the Present Case</u>

Plaintiff's Motion for Sanctions focuses next on three (3) alleged instances of suppression of key evidence by Defendants and their former counsel, Mr. Goldschmidt, in this case:  (1) the

production of false gross revenues incurred during the sale of Redneck Beer, which significantly underestimated the total sales of Redneck Beer, Pl.'s Mot. for Sanctions at 13 & n.10; (2) the apparent withholding by Mr. Fischer and Mr. Goldschmidt of the fact that the Atkins' Logo was used in t-shirts produced and sold under license, *id.* at 13-20; and (3) the "missing" documents in this case, subject to this Court's discovery-related production orders requiring Plaintiff to share certain documents with Defendants' new counsel, Pl.'s Reply at 11-13.  The Court shall review each allegation regarding the illegitimate suppression of evidence in turn.

       i.     *Production of False Gross Revenues*

In Plaintiff's Motion for Sanctions, Plaintiff, in a lengthy footnote, implies that the income tax returns filed by Defendants as part of discovery in this case -- relevant for purposes of damages -- significantly understate the total gross revenues garnered by the Fischer Brewing Company through the sale of Redneck Beer.  *See* Pl.'s Mot. for Sanctions at 13 & n.10.  In support of this inference, Plaintiff relies on two separate *Washington Post* articles, from 1997 and 2000, respectively, in which she claims that "Fischer reported to the *Washington Post* that he had sales of well over 375,000 cases of Red Neck beer between March 1995 and March 1996" and that Defendants ultimately "sold almost 15 million bottles of Red Neck Beer." *Id.* at n.10.  Using these figures, Plaintiff estimates that sales of Redneck Beer should have earned Defendants between $3.4 – 5.7 million in gross revenues.  *Id.*  Linking this disparity to the past conduct of Defendants in other litigations, Plaintiff suggests that Defendants falsified their federal income tax returns.  *Id.*[3]

---

[3] It is worth noting that Plaintiff, perhaps convinced by the strength of Defendants' response to this implication, completely dropped these insinuations in her Reply, and failed to reassert her theory of income tax evasion and discovery suppression.

Three central problems exist with Plaintiff's insinuations, each of which decisively undermines her assertion of falsification. First, Plaintiff distorts the true content and context of the two aforementioned *Washington Post* articles. In a January 23, 1997 article, the *Washington Post* reported that Mr. Fischer "created and began bottling Redneck Beer -- an American-style brew of which he has sold almost 15 million bottles"; however, the article was primarily concerned with Mr. Fischer's failed acquisition of the national Palm Restaurant chain -- the article made no further mention of Redneck Beer, and provided no source for its figures. *See* Margaret Webb Pressler, *Palms Down on $70 Million; Offer to Buy Falls "Significantly" Short of Tempting Pricey Chain*, WASH. POST, Jan. 23, 1997, at E1. The second article cited to by Plaintiff, published on January 17, 2000, is an extensive discussion of the downfall of the Fischer Brewing Company and Redneck Beer. *See* Margaret Webb Pressler, *The Beer Baron Signs Off On a Dream*, WASH. POST, Jan. 17, 2000, ("*The Beer Baron*") at F10. However, rather than noting that Fischer Brewing Company "had sales of well over 375,000 cases of Red Neck Beer," as Plaintiff claims, *see* Pl.'s Mot. for Sanctions at 13 n.10, the article simply reports that "Redneck sold extremely well, and by March, Fischer *had sent* 375,000 cases of beer to distributors in 34 states," *The Beer Baron* at F10 (emphasis added). There is certainly an important distinction between goods shipped to vendors and goods ultimately sold. Plaintiff's conflation of these two very different concepts, and her failure to recognize that one cannot infer gross revenues from items shipped, undermines her claim based on these news articles that Defendants falsified their income for the purposes of their federal income taxes and discovery in this case.

30

Second, during discovery in this case, Defendants produced over nine hundred (900) pages of financial statements and tax documents pertaining to the Fischer Brewing Company. These documents include complete federal tax returns for the years 1995 and 1996, year-to-date general ledgers, accountants' compilation reports of revenues, expenses, assets, and liabilities, as well as supporting documentation for these reports. *See* Defs.' Opp'n, Ex. A (Aff. of Pete V. Albanis, counsel for Mr. Fischer) at 1-2. These federal tax returns and year-to-date general ledgers were audited by the accounting firm of Reiberger, Pollekoff & Kozak. *See* Defs.' Opp'n, Ex. B (Aff. of Bruce Pollekoff) at 1. In response to Magistrate Judge Kay's May 1, 2000 Order in this case, Mr. Fischer even produced an affidavit from the Fischer Brewing Company's accountant, Mr. Bruce Pollekoff, stating that there was no commingling of funds between the Fischer Organization, Inc., and the Fischer Brewing Company. *Id.* at 1-2. Plaintiff's motion finds no fault with any of this substantial documentation; indeed, instead of showing internal conflicts within Defendants' financial disclosures, Plaintiff relies solely upon a misreading of an unreliable, outside source to impugn Defendants' tax returns. Given the efforts of Defendants in producing detailed financial information and providing evidence supporting the veracity of that production, Plaintiff's baseless assertions cannot be sustained.

Third, Plaintiff fails to recognize that newspaper articles constitute inadmissible hearsay, and cannot be admitted into evidence to support the truth of the matter asserted. "Evidence constituting hearsay is normally inadmissible because it lacks sufficient guarantees of reliability." *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 123 (D.D.C. 2002) (citing Arthur Best, *Evidence: Examples and Explanations* at 61 (2d Ed.) (noting that "the reliability problems of out-of-court statements are thought to be so great that common law decisions and the Federal Rules

31

of Evidence take the position that a rule of exclusion will produce the fairest results overall")).

Courts have routinely concluded that "'[u]nsupported newspaper articles usually provide no

evidence of the reporter's perception, memory or sincerity and, therefore, lack circumstantial

guarantees of trustworthiness.'" *Id.* (quoting *Eisenstadt v. Allen*, 113 F.3d 120, 1997 WL 211313

(9th Cir. 1997) ("newspaper articles clearly fall within the definition of hearsay . . . and, thus, are

inadmissible") and citing *United States v. Harris*, 271 F.3d 690, 696 (7th Cir. 2001) (noting that

"daily newspapers are not reliable evidentiary sources")).  As such, courts within this Circuit

have consistently barred newspaper articles from introduction as evidence due to the fact that

they constitute inadmissible hearsay.  *See, e.g.*, *Metro. Council of NAACP Branches v. Fed.

Communications Comm'n*, 46 F.3d 1154, 1165 (D.C. Cir. 1995) ("We seriously question whether

a New York Times article is admissible evidence of the truthfulness of its contents."); *United

States v. Pollard*, 161 F. Supp. 2d 1, 6 (D.D.C. 2001) (barring admission of newspaper articles as

insufficient proof of a party's claim).  Given that Plaintiff's accusation of tax fraud rests solely

upon inadmissible hearsay that cannot stand as evidence of the truth of the matter asserted,

Plaintiff's argument is without foundation and does not warrant the Court's further consideration.

ii.    *Alleged Withholding of Cambridge Apparel Material*

Plaintiff's Motion for Sanctions next accuses Mr. Fischer and Mr. Goldschmidt of

intentionally withholding the most complete iteration of the Fischer Brewing Company Business

Plan, which would have revealed the fact that Defendants licensed the exclusive right to

manufacture Redneck Beer apparel containing the Atkins Logo to Cambridge Sportswear, Inc.,

and which included attached photographs of sample clothing attire bearing the Redneck Beer

name and logo.  *See* Pl.'s Mot for Sanctions at 13-20.  Plaintiff notes that this material was

clearly subject to her First Request for the Production of Documents and Things, which

specifically demanded "Original copies of all REDNECK BEER PRODUCTS or other things

bearing the REDNECK BEER ILLUSTRATIONS or the name REDNECK BEER." *Id.* at 14

(citing Pl.'s First Request for Docs. at 6, Request No. 3). Plaintiff further objects to the fact that

Defendants did not provide her samples of the resulting sportswear apparel, despite the broad

nature of her document request and despite the fact that such samples apparently existed. *See id.*

at 14-15 (noting that in a deposition in the *Flax* litigation, Mr. Fischer testified that "clothing was

produced, and I have some samples").

Plaintiff first became aware of the existence of a deal between the Fischer Brewing

Company and Cambridge Sportswear when Defendants produced one iteration of a Redneck

Beer-related Business Plan created by Mr. Fischer in order to gain investors in his enterprise. *See*

*id.* at 15-17; *see also* Pl.'s Mot. for Sanctions, Ex. 19 (Business Plan produced in this case).

Plaintiff did not investigate this deal further because she apparently relied on Mr. Fischer's claim

that "Cambridge Sportswear simply produced Redneck branded sportswear, but not sportswear

using the Atkins logos she designed," Pl.'s Reply at 14, and his promise that Defendants had

produced all documents in this case, Pl.'s Mot. for Sanctions at 17. Moreover, Plaintiff was

provided no photographs of the apparel during discovery. *Id.*

According to Plaintiff, because the material provided "did not include any depiction of

the Redneck Branding wearing apparel showing use of the Atkins logos," Pl.'s Reply at 14, she

did not consider the Cambridge Sportswear agreement to be a key issue in this case. In the

Spring of 2004, however, Plaintiff discovered that a more complete Business Plan not produced

in this litigation did reveal the licensing of the Atkins Logo to Cambridge Sportswear. Pl.'s

Reply at 20 n.25; Pl.'s Mot. for Sanctions at 16-17 & Ex. 20 (Business Plan not produced in this case).  Plaintiff, armed with this new information, now asserts that the complete Cambridge Sportswear information is a major issue, and -- based on Defendants' past behavior and the context of the document production -- that information was intentionally withheld.  *See* Pl.'s Mot. for Sanctions at 12-20.

Plaintiff contends that this intentional withholding of discovery had two major impacts on this litigation:  (1) it needlessly, and substantially, increased the discovery-related costs of this litigation, *see id.* at 17-18; and (2) it led this Court to conclude erroneously that Defendants had been granted a nonexclusive license to use the Atkins Logo, whereas knowledge of an exclusive license regarding that Logo would have precluded summary judgment, *see id.* at 18-20.  According to Plaintiff, because of Defendants' malfeasance, Plaintiff was forced to undertake a costly -- although ultimately successful -- appeal.  Plaintiff contends that this wrongful suppression of material evidence would have continued in this case had Plaintiff not had an opportunity in the Spring of 2004 to review documents produced in the related *Fischer v. Flax* litigation in the Superior Court of the District of Columbia, wherein she discovered the existence of a more detailed Business Plan.  *See id.* at 16-17; Pl.'s Reply at 20 n.25.

Given the intricate factual background of this argument, and the parties' cross-accusations as to this matter, the Court shall carefully review, on a step-by-step basis, the context of Plaintiff's contention that Defendants and their former counsel, Mr. Goldschmidt, intentionally withheld this information.  First, it is uncontested that during the deposition process in this case, Mr. Fischer testified that the Fischer Brewing Company produced several versions of a Redneck Beer-related business plan in order to attract investors; according to Mr. Fischer, the

Business Plan "was prepared, 1995, modified several times throughout the period of six months."

Defs.' Opp'n, Ex. E (3/20/00 Fischer Dep. at 1180:16-17). Second, it is also uncontested that

both the version of the Business Plan produced during discovery in this case (Plaintiff's Exhibit

19 to her Motion for Sanctions) and the version not produced during discovery in this case

(Plaintiff's Exhibit 20 to her Motion for Sanctions) were originally produced in the *Fischer v.*

*Flax* litigation in the Superior Court for the District of Columbia that occurred

contemporaneously to this action. Pl.'s Reply at 14; Defs.' Opp'n at 6-7. However, these

documents were produced in the *Fischer v. Flax* litigation by a third-party defendant in that case,

Laidlaw & Co., and not by Defendants here. *See* Defs.' Opp'n, Ex. E (3/20/00 Fischer Dep.) at

1181 (during Mr. Fischer's deposition in this case, Mr. Goldschmidt interjects and notes that the

Business Plan introduced as an exhibit by Plaintiff originally came from Laidlaw's files, as

indicated by the LBF prefix on the Bates stamp); Defs.' Opp'n at 6-7; Goldschmidt Opp'n at 6;

Pl.'s Mot. for Sanctions at 16 n.11. The Business Plan produced in this case is roughly 193

pages long, *see* Pl.'s Mot. for Sanctions, Ex. 19, while the Business Plan not produced in this

case is roughly 199 pages in length and attaches photographs of the resulting Redneck Beer-

related apparel, *id.*, Ex. 20.

  Given that it is also uncontested that Defendants never produced the 199-page Business

Plan in this case (Exhibit 20), the Court must look at what information it currently has before it

in order to determine whether Defendants' failure to produce that document was negligent or

intentional. Three considerations compel the Court to conclude that Defendants' non-production

of the 199-page Business Plan was ultimately the result of negligence on their part. First, the

relevant timeline does not support Plaintiff's assertion that Defendants withheld the most

complete Business Plan iteration because they had knowledge that its contents would prevent a ruling in their favor under an implied license theory.  Simply, this case was first filed in March 1998, and discovery began in earnest on or before February 1999.  Defendants, however, did not think to add an affirmative defense of "implied license" until December 29, 2000, when they finally entered a Motion to Amend their Answer to Plaintiff's Complaint in order to assert such a claim.  *See* Defs.' Mot. to Amend Answ.  On February 15, 2001, this Court entered an order granting Defendants' motion, but forcing Defendants to pay for all costs related to the reopening of discovery surrounding their "implied license" claim.  *See Atkins v. Fischer*, Civ. No. 98-800 (D.D.C. Feb. 15, 2001) (order granting Defendants' Motion to Amend but ordering sanctions); *Atkins v. Fischer*, Civ. No. 98-800 (D.D.C. May 11, 2001) (order denying Plaintiff's Motion to Strike Defendant's "implied license" defense); *Atkins v. Fischer*, Civ. No. 98-800 (D.D.C. Feb. 7, 2002) (order modifying the previous sanctions order).  Therefore, it cannot be said that Defendants had a grand plan to emerge victorious on an "implied license" argument from the very start of this litigation; rather, such an argument was only first put forward roughly three (3) years after the instigation of this case and after the close of all discovery.  Given the late hour of the "implied license" defense and the fact that they had to pay for reopened discovery, it is highly unlikely that (1) Defendants realized that the additional material in the 199-page plan could have endangered that defense, and then (2) purposefully sought to suppress that information for three years in advance in order to assure the success of that late defense.  Instead, all evidence points to the fact that Defendants only thought of the "implied license" defense at the last minute and, having already produced a Business Plan, were negligent in not providing a later iteration despite their continuing duty to produce it.

36

<u>Second</u>, Defendants' disclosures belie Plaintiff's accusation that they intentionally suppressed the fact that the Cambridge Sportswear agreement might have implicated the Atkins Logos.  Multiple documents produced by Defendants in this case clearly put Plaintiff on notice that the apparel agreement implicated Redneck Beer logos and designs.  For instance, the 193-page Business Plan actually produced in this litigation clearly indicates in the "Marketing" section that:

> The Company has made an agreement with Cambridge Manufacturing Company, Inc. located in Appomattox, Virginia to manufacture various outerwear apparel, including but not limited to, T shirts, sweatshirts, hats, gloves, sweaters, pants, coats, jackets, socks, vests, scarfs, dresses, and boxer shorts.  Cambridge Manufacturing currently sells various products to JC Pennys, Kmart, WalMart, and various other retailers.  With over 100 representatives in the field, Cambridge feels that the <u>*REDNECK logo*</u> will have mass appeal.  Cambridge will be providing various outerwear to the Company's distributors.

Pl.'s Mot. for Sanctions, Ex. 19 (Business Plan provided in this case) at 38 (LBF006239; D001223) (emphasis added).  Therefore, while the Business Plan provided in this litigation might not have been the most complete version, it did reveal two key details:  (1) the Cambridge agreement implicated the Redneck logo, not simply the "Redneck Beer" name, and therefore might have concerned the use of the logo Plaintiff designed for Defendants; and (2) actual outerwear bearing such logo(s) was available and discoverable, if not from Defendants then from Cambridge.[4]

---

[4] Plaintiff spends a portion of her argument asserting that Defendant Fischer continues to lie and cover up the fact that the Cambridge Sportswear Apparel agreement implication what she calls "the Atkins Logos."  *See* Pl.'s Mot. for Sanctions at 14 (noting that in a January 19, 2004 deposition in the *In re Fischer* bankruptcy litigation, Mr. Fischer "maintained (untruthfully) that Fischer Brewing Co.'s contract with Cambridge Sportswear was 'to license the name Redneck Beer.  Specifically the name, nothing else.'").  Setting aside the fact that Defendants and Plaintiff have continued to disagree over the meaning of "logo" in this litigation, a review of the photographs of the Redneck sportswear apparel shows that almost all of the apparel featured just

Moreover, Defendants -- in this litigation -- also produced numerous correspondence from Mr. Fischer to Courtland Manufacturing Co. indicating that the various apparel graphics were not up to par.  *See* Defs.' Opp'n, Ex. G (3/18/1996 Letter from Mr. Fischer to Mr. Fred H. Lawson, Jr., of Courtland Manufacturing) at 1 ("This weekend I was in the Sports Authority store and noticed a very large variety of t-shirts that had much better graphics and designs than does the Redneck t-shirts you are currently producing."); *id.* at 2 (2/20/1996 Letter from Mr. Fischer to Mr. Lawson) ("I noticed on . . . the white T-shirt with the Redneck logo . . ."; "With regard to the bandana . . ."; suggesting that the baseball jacket should be "similar to the red and black hat with the logo 'Redneck' embroidered on the front"; noting that "On this design, I do not beleive [sic] a red bandana would be applicable"; expressing hope that "your new artist can come up with more creative ideas"); *id.* at 3 (1/31/96 Letter from Mr. Fischer to Mr. Lawson) (indicating that "the design on the T-shirt was acceptable" but "the graphics did not have enough 'punch'").

The Court points to these disclosures, present in the materials produced by Defendants during discovery in this case, not to suggest that Plaintiff somehow failed in a duty to root out material hinted at but not produced by Defendants as required.  Rather, the Court focuses on this information to emphasize that it is highly unlikely that a guilty party -- intent on suppressing evidence relating to logos that might implicate Plaintiff's design and threaten an "implied license" defense -- would produce so much material revealing the use of Redneck Beer logos and graphics in officially-licensed apparel.  Simply, a perceptive litigant could have used the

---

the Redneck name or the Redneck name on a bottle cap.  *See* Pl.'s Mot. for Sanctions, Ex. 22 (Photographs of Apparel).  Indeed, only roughly two (2) of the fourteen (14) apparel products implicates what Plaintiff has deemed "the Atkins Logos."  As such, contrary to Plaintiff's accusations, it is entirely possible that Mr. Fischer was simply mistaken as to his belief that the apparel only included the Redneck name.

information actually produced by Defendants to defeat Defendants' "implied license" argument

in a manner similar to the one suggested by Plaintiff in her Motion for Sanctions.  *See* Pl.'s Mot.

for Sanctions at 18-20.  While the additional information in the 199-page Business Plan and the

attached photographs of the apparel would have aided that effort, the success of the attack on the

"implied license" defense would not have been wholly dependent on it.  As such, given the sheer

wealth of disclosures made by Defendants relating to the use of Redneck Beer-related logos and

graphics in the production of apparel, the Court concludes that it is more likely than not that

Defendants' non-production of the slightly-longer version of the Business Plan was less

deliberate than negligent.

Third, and finally, Defendants were experiencing a change in lead counsel during the

early portion of their response to Defendants' First Request for Production of Documents and

Things.  While this changeover certainly does not excuse the failure to produce the 199-page

version of the Business Plan, it does help to explain why its nondisclosure might have occurred,

and why that nondisclosure might have been the result of negligence.  While Mr. Goldschmidt

did file an appearance on behalf of Defendants in this case on March 5, 1998, (1) M. Miller

Baker, Esq., and the law firm of Carr Goodson Warner entered their appearance on behalf of the

Fischer Organization, Inc., on June 1, 1998, *see* Docket Entry #16; and (2) Mr. Thomas Patrick

Ryan, Esq., and the law firm of McCarthy, Wilson & Ethridge entered their appearance o behalf

of The Fischer Brewing Company on July 17, 1998, *see* Docket Entry #27.  Messrs. Bakes and

Ryan entered the suit as primary counsel on behalf of Defendants after their insurance company

determined that coverage would be provided, while Mr. Goldschmidt remained in the case solely

for the purpose of prosecuting the Counterclaims -- which were not covered by the insurance

company.  *See* Goldschmidt Opp'n at 4.  Messrs. Miller and Ryan remained the primary attorneys

for Defendants in this case until May 1999, when they withdrew their appearances and Mr.

Goldschmidt became lead counsel.  *See id.* (citing Docket Entries #38 & #39).  The Responses to

Plaintiff's First Request for Production -- which would have covered the various iterations of the

Business Plan -- were prepared, signed, and sent off by Messrs. Miller and Ryan on March 29,

1999, and April 4, 1999, i.e., before Mr. Goldschmidt began as lead counsel in this case.  *See*

Goldschmidt Opp'n, Exs. 4 & 5.[5]

     Plaintiff is correct to point out that the 193-page Business Plan actually produced by

Defendants in this case (Exhibit 19 to Plaintiff's Motion for Sanctions) was originally produced

by Laidlaw & Co. in the *Flax* litigation; as such, Mr. Goldschmidt -- attorney for Mr. Fischer in

that litigation -- necessarily had to transmit that document to Messrs. Miller and Ryan, who then

provided it to Plaintiff as part of discovery.  It is therefore unexplained as to why Mr.

Goldschmidt turned over the 193-page Business Plan from the *Flax* litigation for discovery in

this case, but not the 199-page Business Plan (Plaintiff's Exhibit 20).  Moreover, once Mr.

Goldschmidt assumed the lead counsel position in this case, he certainly had a duty pursuant to

Federal Rule of Civil Procedure 26(e)(2) to continue to supplement all disclosures, responses,

and documentary evidence in discovery.  *See Klonoski v. Mahlah*, 156 F.3d 255, 268 (1st Cir.

1998) (Rule 26 "imposes a broad requirement on parties to update their earlier disclosures and

---

[5] In Defendants' Responses to Plaintiff's First Document Request, Mr. Ryan, then lead
attorney for Defendants, responded to Plaintiff's request by noting that "[c]opies or samples of
all Redneck Beer Products will be produced at a mutually agreed time and place.  If defendants
become aware of any products not provided, this response will be supplemented."  Defs.' Opp'n,
Ex. C (Defs.' Responses to Pl.'s First Document Request) at 2-3.  Based upon the present record,
it is unclear whether Plaintiff's counsel actually followed up this response and/or requested
production at a mutually agreed time and place.

discovery responses"); 8 Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, *Federal Practice and Procedure* § 2049.1 (2d. ed. 1994).  Given these considerations, the Court considers the changeover in counsel and the possible confusion resulting from that transition to be a mitigating factor in the nondisclosure of the 199-page Business Plan.  While such a transition certainly does not excuse the ultimate negligent failure by Defendants and their counsel to produce the document, the changeover does help to explain how a mistake might have taken place.

In sum, the Court concludes that Plaintiff has not introduced sufficient evidence -- let alone the kind of "clear and convincing evidence" required for default judgment, *see Shepherd*, 62 F.3d at 1472 -- to establish that Defendants and their former counsel, Mr. Goldschmidt, intentionally withheld and suppressed the 199-page Business Plan, which contained a more detailed discussion of the Cambridge Sportswear apparel deal involving Redneck Beer logos and some sample photographs.  Rather, the Court concludes that the nondisclosure was likely the result of inexcusable negligence, given (1) the timeline of discovery and Defendants' late introduction of the "implied license" affirmative defense; (2) the substantial disclosures present in the materials actually produced by Defendants that indicated the Cambridge deal involved the use of logos and that showed Mr. Fischer's displeasure with the use of graphics and logos on that apparel; and (3) the changeover in counsel during the discovery process, which might well have complicated and confused the production process.

The Court further concludes that Defendants' lack of production of the 199-page Business Plan and the sample photographs does not sustain Plaintiff's claim that she was unduly prejudiced at the motion's stage in this litigation.  Rather, the Court finds that, based on the

41

materials produced by Defendants in this litigation, substantial support for Plaintiff's response to

Defendants' implied license defense -- as identified in her current Motion for Sanctions -- was

available to Plaintiff at that time.  Moreover, given the fact that Plaintiff now has the complete

199-page Business Plan and sample photographs, Plaintiff will not be prejudiced when the trial

in this case occurs.  Plaintiff's ultimate lack of prejudice, however, does not excuse Defendants'

negligent lack of production.  As discussed in further detail in this Memorandum Opinion, *infra*

Section III(A)(5), the Court refuses to condone such a failing in Defendants' discovery

obligations; accordingly, employing its discretion  and acting pursuant to its inherent powers, the

Court shall impose a fine of $5,000.00 upon Defendants and their former counsel Mr.

Goldschmidt, to which both Defendants and Mr. Goldschmidt are jointly and severally liable.

>            iii.    *Allegation that Defendants Are Still Withholding Information*

Finally, in an argument raised in her Reply but not her Motion for Sanctions, Plaintiff

accuses Mr. Goldschmidt specifically of continuing to withhold documents.  *See* Pl.'s Reply at

11-13.  Plaintiff contends that the documents missing from Defendants' possession, and subject

to this Court's production-related orders of August 17, 2004 and December 1, 2004, are currently

in Mr. Goldschmidt's possession.  *Id.*  To substantiate this claim, Plaintiff cites to an October 20,

2004 hearing in Mr. Fischer's bankruptcy case, during which Mr. Fischer posited that his former

counsel, Mr. Goldschmidt, retained 100 to 200 boxes of his business files -- of which he now

cannot access.  *Id.* at 12 (citing 10/20/04 Bankruptcy Hrg. at 70-74).  As such, Plaintiff finds fault

with Mr. Goldschmidt's October 29, 2004 Affidavit in this case in which he "never stated that he

had 100 to 200 boxes of Fischer documents" and only stated that "he looked only in his office

and that 'Security Storage informed me that they do not have any record of any Fischer/Atkins

files in storage.'" *Id.* at 13 (citing 10/29/04 Goldschmidt Aff. ¶ 10). Moreover, Plaintiff also

finds fault with Defendants over this issue, noting that Mr. Fischer apparently "made no effort to

demand in writing (as opposed to orally) that Goldschmidt turn over all of the 100 to 200 boxes

to Fischer, or to Chicago Counsel," i.e., Plaintiff's most recent counsel in this action. *Id.*

Plaintiff concludes by suggesting that she has "absolutely no doubt that the allegedly missing

Fischer documents can be found (or recreated from) the 200 boxes and that Messrs. Fischer and

Goldschmidt have, yet again, played games with this Court and with everyone else in this case."

*Id.*

Three problems exist to undermine Plaintiff's argument. <u>First</u>, Plaintiff's argument

concerning boxes allegedly withheld by Mr. Goldschmidt was introduced for the first time in her

Reply; her original Motion for Sanctions made no mention of such a problem, and Plaintiff filed

no supplement to her Motion for Sanctions preceding Defendants' Opposition. As such, her

argument is procedurally improper. *See Presbyterian Med. Ctr. of the Univ. of Penn. Health Sys.

v. Shalala*, 170 F.3d 1146, 1152 (D.C. Cir. 1999) (court need not consider an argument raised for

the first time in reply brief); *Town of Norwood, Mass. v. Fed. Energy Regulatory Comm'n*, 962

F.2d 20, 25 (D.C. Cir. 1992) ("because the petitioner did not preserve the argument in its opening

brief, we reject as untimely the petitioner's attempt to raise the point in its reply brief"); *McBride

v. Merrell Dow and Pharmaceuticals, Inc.*, 800 F.2d 1208, 1210 (D.C. Cir. 1986) ("We generally

will not entertain arguments omitted from an appellant's opening brief and raised initially in his

reply brief.").

<u>Second</u>, contrary to Plaintiff's claims, all evidence in the record indicates that Mr.

Goldschmidt has turned over all documents relating to this case that he has located. In addition

to his October 29, 2004 Affidavit in this case, which was not required by the Court's August 17, 2004 Order, Mr. Goldschmidt filed a May 25, 2005 Supplemental Affidavit indicating that he had discovered and turned over new materials.  According to Mr. Goldschmidt,

> I recently came across certain documents related to this case.  They were mixed in boxes relating to another legal matter that I had one time handled for Mr. Fischer. I would classify such documents as 'miscellaneous' documents, in no particular order, such as portions of files from one of the law firms that previously represented the Defendants in this case (aside from myself) and what appear to be extra copies of some deposition exhibits.  I did not find any deposition transcripts or document productions.  The documents, in aggregate, fit into two boxes.

*See* 5/25/05 Goldschmidt Suppl. Aff. at 1-2, ¶ 4.  Mr. Goldschmidt further attests that, "To the best of my knowledge, I have no further Fischer/Atkins files or documents in my office or in storage.'  *Id.* at 2, ¶ 5.  Mr. Goldschmidt's continuing good faith supplementation of information, as he locates it, makes it less likely that he is intentionally hiding information relating to this case.  Moreover, at this point, there is no basis on the present record to assume that all documents have not been turned over.

Third, while Plaintiff attempts to reargue the "missing document" issue -- i.e., the fact that Defendants' most recent counsel was lacking necessary documents originally produced during the 1998-2001 discovery process in this case because they had not been turned over or were lost -- the Court has effectively resolved this issue with its August 17, 2004 and December 1, 2004 Orders.  As the parties themselves both admitted in Status Reports filed on January 6 and 7, 2005, all issues involving the missing discovery have been resolved, and the necessary documents have been shared by Plaintiff with Defendants' most recent counsel.  Moreover, it is clear that Defendants are not withholding the "missing" documents:  pursuant to the Court's twin orders, Defendants were forced to pay for both the cost of preparing and copying the documents,

as well as for the time spent by representatives of Plaintiff's counsel in aiding the enterprise. As such, it would defy economic logic for Defendants to pay to access Plaintiff's discovery-related information in this case when they already possessed such materials. Accordingly, even assuming *arguendo* that Mr. Goldschmidt was somehow withholding further documents in this case, Plaintiff has introduced no evidence that Defendants have any role in that suppression of evidence. Indeed, given that this case has been active for over seven (7) years, has gone up to the Court of Appeals, and has involved multiple counsel on all sides, it is quite likely that the "missing" documents were simply lost or misplaced in the process. Accordingly, the Court finds that Plaintiff has not established that Defendants are continuing to withhold the formerly "missing" documents relevant to this case.

   3. <u>Plaintiff's Contention that Mr. Fischer Fabricated the Mock-Up Bottle</u>

   Plaintiff's third major argument in favor of the sanction of default judgment against Defendants is her assertion that Mr. Fischer fabricated the prototype mock-up bottle of Redneck Beer that he claims he created prior to meeting with Plaintiff to discuss logo designs. *See* Pl.'s Mot. for Sanctions at 20-25; Pl.'s Reply at 23-30. Plaintiff claims that it is apparent that Mr. Fischer fabricated this evidence after the fact in an attempt to defeat her claims "just as he fabricated the Howard Reissner letters in the *Fischer v. Flax* litigation after the fact to support his claim there." Pl.'s Reply at 30. Specifically, Plaintiff bases her contention on four (4) main arguments: (1) contrary to Mr. Fischer's deposition testimony, *see* 4/3/00 Fischer Dep. at 388, the mock-up bottle was not a Budweiser beer bottle at all, *see* Pl.'s Mot. for Sanctions at 23-24 (citing 7/28/00 Dep. of Mark Elliott, Senior Manager in the Packaging Technology Group for Anheuser Busch); (2) the refusal by Plaintiff's former counsel, Mr. Goldschmidt, to hand over

45

the actual bottle for further testing leads to an inference that Defendants were aware that the bottle was created *ex post facto*, and sought to hide that fact, *id.* at 24-25; (3) virtually all testimony in this case indicates that no one was shown the mock-up bottle by Mr. Fischer, contrary to his assertions, *id.* at 22, Pl.'s Reply at 25-28; and (4) Plaintiff's review of standard bottle markings in the United States has led her to "believe that the symbol '96' on the mock-up bottle refers to the year of manufacture of that bottle," ensuring that the mock-up was created long after Mr. Fischer held discussions with Plaintiff regarding design plans, Pl.'s Reply at 29.

Defendants and Mr. Goldschmidt, in responding to Plaintiff's allegations, do not address Plaintiff's contentions that the mock-up bottle was not a Budweiser bottle and that the symbols on the bottle indicate that it was likely manufactured in 1996. However, Defendants and Mr. Goldschmidt spend a significant amount of time and effort pointing to (1) various documentary evidence, including letters dated from 1993 and 1995 that apparently refer to Mr. Fischer's preliminary sketches and the mock-up bottle itself, *see* Defs.' Opp'n 11-12, Goldschmidt Opp'n at 7-8; (2) Mr. Fischer's own deposition testimony, which contradicts Plaintiff's assertions, *see* Defs.' Opp'n at 10-11; and (3) the testimony of numerous third-party witnesses that supports Mr. Fischer's version of the mock-up bottle story, either explicitly or implicitly, including the testimony of Mr. Craig Goodman, Mr. Gary Nordinger, Mr. Regis Sabol, Mr. Steve Solomon, and Mr. Harvey Berkman, *see* Defs.' Opp'n at 12-14, Goldschmidt Opp'n 7-9.

Here, the Court is faced with a major dispute of material fact for which it has neither the information nor the inclination to attempt to resolve at this point. This kind of fundamental issue, upon which there is conflicting discovery, testimony, and scientific evidence, involves the kind of balancing and credibility determinations best left for trial. Plaintiff has now been

provided access to the mock-up bottle, and is certainly free to call experts during the upcoming

trial in this action in an attempt to undermine Defendants' claims. Plaintiff is further welcome to

cross-examine Defendants' witnesses and Mr. Fischer himself in an attempt to undermine their

credibility or poke holes in portions of their recollections. However, given the fundamental

conflict and important issue at stake, it is simply inappropriate for the Court to order the

draconian sanction of default judgment -- essentially based upon a determination of fact -- for

Plaintiff on this issue. It may well prove that the fact-finder ultimately agrees with Plaintiff's

assessment, and finds that Mr. Fischer did construct the mock-up bottle after the fact in order to

undermine Plaintiff's claims; based on the present record, such a determination is simply not one

that this Court can -- or should -- make.

        4.        <u>Plaintiff's Allegation that Defendants' Counterclaims Were Filed Without Legal or Factual Basis</u>

Plaintiff's final argument in her Motion for Sanctions against Defendants and their former

counsel, Mr. Stanley H. Goldschmidt, Esq., is an assertion that that Defendants' counterclaims in

this case -- (1) breach of contract; (2) tortious interference with business relations; (3)

infringement of trademark; and (4) infringement of the trademark -- were filed without legal or

factual basis. *See* Pl.'s Mot. for Sanctions at 26-27; Pl.'s Reply at 30-35. Plaintiff contends that

Messrs. "Fischer and Goldschmidt filed baseless counterclaims simply to harass the Plaintiff.

They did not pursue these counterclaims aggressively because they knew they had no factual

basis for them." Pl.'s Reply at 35. As such, Plaintiff argues that sanctions pursuant to this

Court's inherent power, or Federal Rule of Civil Procedure 11, are appropriate. *Id.* at 34-35.

Both Defendants and Mr. Goldschmidt spend a significant time explaining why their counterclaims were filed in good faith, recounting concerns that (1) Plaintiff may have breached her contract with Defendants by providing inferior artwork, requiring them to seek the assistance of other graphic artists to create the final Redneck Beer design (Counterclaim I), *see* Defs.' Opp'n at 17-18; (2) Plaintiff, by allegedly contacting third-parties such as Stroh's Brewing Company and asserting her ownership of the copyright of the relevant designs (the validity of which Defendants questioned) against Defendants, could have produced the kind of "chilling effect" on their efforts to sell Redneck Beer and advertise merchandise that constituted tortious interference (Counterclaim II), *id.* at 18-19, Goldschmidt Opp'n at 10; and (3) Plaintiff, by filing an application for a copyright of the Redneck Beer-related logos with the United States Copyright Office, might have been contemplating the use of those designs in commerce. which they felt could have constituted trademark infringement, Defs.' Opp'n at 19-20, Goldschmidt Opp'n at 10.  Upon an analysis, the Court finds Defendants explanations as to the good faith basis of their counterclaims to have a sufficient basis to preclude sanctions.

Moreover, the Court notes that Defendants' counterclaims were filed over seven (7) years ago and Plaintiff's previous counsel never filed a Motion for Rule 11 Sanctions at that time. Plaintiff contends that she has not waived objections to the good faith basis of Defendant's counterclaims because she served Mr. Goldschmidt with a draft Rule 11 sanctions motion regarding those counterclaims on May 19, 1998, *see* Pl.'s Reply, Ex. E (draft motion for sanctions).  However, despite threatening to file the motion with the Court if Defendants did not withdraw their counterclaims within twenty-one (21) days, *id.* at 2, it is uncontested that Plaintiff never filed that motion with this Court; Plaintiff preferred instead to file a Motion to Dismiss

Defendants' Counterclaims.  Given that over seven (7) years have passed since Defendants filed

their counterclaims in this action, the Court finds Plaintiff's attempted resurrection of her

moribund sanctions motion to be untimely.

Finally, the Court emphasizes that Defendants' counterclaims, which proved to ultimately

be fruitless, are no longer part of this litigation and were dealt with through appropriate channels.

While these counterclaims proved ultimately to be futile, the Court notes that counterclaims are

filed before discovery has commenced, often when a party, uncertain of how the facts will turn

out, simply wants to preserve their rights.  Some leeway in the evaluation of the basis for those

counterclaims is in order.  After Defendants' filed their counterclaims, Plaintiff brought a Motion

to Dismiss those claims; this Court granted Plaintiff's motion as to Counterclaim I (breach of

contract), but denied the motion as to the remaining counterclaims.  As such, the Court's ruling

implicitly indicated that some discovery as to the remaining counterclaims was certainly

warranted.  Once discovery commenced, the remaining three (3) counterclaims were ultimately

dismissed by Defendants' own stipulation on September 26, 2000 -- essentially, Defendants,

recognizing the futility of their counterclaims, properly withdrew them from consideration in this

case.

Accordingly, given the explanations provided by Defendants and Mr. Goldschmidt, the

significant time gap between Defendants' introduction of their counterclaims and Plaintiff's

Motion for Sanctions, the leeway provided to party's in filing counterclaims, and the ultimately

appropriate resolution of those counterclaims, the Court finds that neither Defendants nor Mr.

Goldschmidt engaged in conduct with respect to Defendants' counterclaims in this case that rose

to the level of being sanctionable.

5.     Summary

Plaintiff requests the draconian sanction of default judgment in her favor given the alleged malfeasance of Defendants and their former counsel, Mr. Stanley Goldschmidt.  While the Court acknowledges and considers their oft-sanctioned activities in the *Flax v. Fischer* and *In re Fischer* litigations, Plaintiff still must establish by clear and convincing evidence that Defendants and Mr. Goldschmidt engaged in significant sanctionable activity in this case in order to take such a drastic step, or even to impose lesser sanctions.  Considering the totality of the circumstances identified by Plaintiff, the Court -- in exercising its discretion -- finds that default judgment in favor of Plaintiff is not the appropriate remedy in this case.  Rather, the Court concludes that (1) Plaintiff has presented no valid evidence indicating that Defendants falsified the total revenues related to Redneck Beer; (2) Plaintiff has failed to provide sufficient evidence to indicate that Defendants' nondisclosure of the 199-page Business Plan (Exhibit 20 to Plaintiff's Motion for Sanctions) was intentional rather than negligent, or that she was substantially prejudiced by Defendants' nondisclosure during either the motions stage in this case or at this time before trial; and finds that (3) the "missing" documents issue has been resolved by two earlier orders entered by this Court, and Plaintiff has presented no new evidence indicating that documents produced in this case were subsequently "lost" due to the malfeasance of Defendants or Mr. Goldschmidt.  While Plaintiff spends an inordinate amount of time attempting to convince the Court that Mr. Fischer fabricated the prototype mock-up bottle of Redneck Beer, this issue ultimately constitutes a major conflict of material fact -- one that is best left for the forthcoming trial.  Finally, Plaintiff's efforts to resurrect a seven (7)-year old argument that Defendants' counterclaims were filed in bad faith is unavailing given the sufficient basis for the

filing at the time, the passage of time, and the appropriate resolution of those counterclaims.

As such, the Court finds that Plaintiff has not established, through clear and convincing evidence, a basis for an entry of default judgment in her favor pursuant to any of the Federal Rules or this Court's own inherent power. The Court notes that, in addition to the problems identified above, (1) there are simply too many disputes of material fact on the present record to justify such a draconian action; (2) Judge Graae, in imposing significant sanctions in the *Flax* litigation, only took such a step after making findings pursuant to a bench trial on the "bad faith litigation" counterclaims; (3) Defendants' nondisclosure did not directly contravene any of this Court's Orders, and was not directly covered by any of Plaintiff's Motions to Compel in this case; and (4) after the completion of the trial in this case, it may well be the case that some of these factual disputes will be resolved and the alleged conduct of Defendants and their former counsel, Mr. Goldschmidt, more apparent.

However, the Court finds that Plaintiff has established that Defendants and Mr. Goldschmidt failed to meet the discovery obligations to provide all requested materials in discovery, and to supplement any document productions -- a fact essentially uncontested by Defendants and Mr. Goldschmidt. Specifically, Defendants and Mr. Goldschmidt failed to produce the complete 199-page Business Plan and attendant sample photographs as required. Based upon the totality of circumstances identified by Plaintiff and the present record, the Court concludes that this failure was the result of their negligence, and not intentional malfeasance. While such a negligent violation of their discovery obligations did not substantially prejudice Plaintiff in this case, the failing did cause Plaintiff to spend extra time and resources in an effort to locate the information and then litigate the nondisclosure. As such, the Court -- employing its

discretion and exercising its inherent powers -- shall impose a fine of $5,000.00 upon Defendants

and Mr. Goldschmidt as a sanction, to be owed jointly and severally, to be paid to Plaintiff before

the trial date in the above-captioned action.  Accordingly, the Court shall grant-in-part and deny-

in-part Plaintiff's Motion for Sanctions.

B.    *Mr. Goldschmidt's Motion for Rule 11 Sanctions*

As noted previously, Mr. Goldschmidt's Motion for Rule 11 Sanctions simply

incorporates his Opposition to Plaintiff's Motion for Sanctions, and contains little more than the

statutory framework for Federal Rule of Civil Procedure 11 and various conclusory statements.

*See* Goldschmidt's Mot. for Sanctions at 1-2.  As may be discerned through a review of Mr.

Goldschmidt's Opposition, Mr. Goldschmidt is essentially complaining that (1) Plaintiff's

Motion for Sanctions was filled with a "number of false accusations, innuendo and

misrepresentations," Goldschmidt Opp'n at 1, because "in attempting to build a case against [Mr.

Goldschmidt], Mr. Recio [Plaintiff's counsel] deliberately omitted certain material facts, along

with documentation, of which he has knowledge and possession, that completely exonerates [Mr.

Goldschmidt]," *id.* at 2; and (2) Mr. Recio's motion and communications with Mr. Goldschmidt

have been filled with repeated derogatory comments and "cheap shots" on the public record

regarding Mr. Goldschmidt's former medical condition, *id.* at 3, 11-12.[6]

Plaintiff's response does not address the substance of Mr. Goldschmidt's assertions.

Rather, Plaintiff contends that because Mr. Goldschmidt is the former counsel to Defendants in

this case, and not a party to this litigation, he lacks standing to file a Rule 11 motion on his

---

[6] Mr. Goldschmidt notes that rather than the "drug induced intoxication" described by
Plaintiff's counsel, he "was misdiagnosed by two prominent physicians and was overly
prescribed legally prescribed medication."  Goldschmidt Opp'n at 11.

behalf.  Pl.'s Opp'n to Goldschmidt's Mot. for Sanctions at 1-2.  Moreover, Plaintiff contends

that Mr. Goldschmidt cannot be awarded the attorney's fees that he requests pursuant to Rule 11

because he is proceeding *pro se* and therefore has not incurred any such fees.  *Id.* at 2.

 Even assuming *arguendo* that Mr. Goldschmidt has standing to bring his Motion for Rule

11 Sanctions, the Court concludes that the motion fails to meet the criteria necessary to sustain a

Rule 11 sanction.  Simply, Mr. Goldschmidt has not established that Plaintiff's Motion for

Sanctions was presented for an improper reason, such as harassment or delay; rather, given the

sheer length, depth, and breadth of Plaintiff's motion, it is evident that Plaintiff legitimately

believed that improprieties had occurred and were continuing in this case.  *See* Fed. R. Civ. P.

11(b)(1).  Moreover, Plaintiff's claims were clearly warranted by existing law, even if Plaintiff

ultimately lacked sufficient evidence to sustain all of her assertions under the law.  *See* Fed. R.

Civ. P. 11(b)(2).  Finally, Plaintiff's contentions certainly had some evidentiary support, as

evidenced by the Court's sanctioning of Defendants and Mr. Goldschmidt for their negligent

failure to comply with their discovery obligations.  Indeed, to a large extent, major disputes of

material facts -- rather than totally baseless claims -- prevented the success of Plaintiff's ultimate

request, i.e., default judgment in her favor.  *See* Fed. R. Civ. P. 11(b)(3).  Because Mr.

Goldschmidt cannot meet the necessary criteria to establish a Rule 11 violation on the part of

Plaintiff, the Court shall deny Mr. Stanley H. Goldschmidt's Motion for Sanctions for Violation

of Federal Rule of Civil Procedure 11.

## IV: CONCLUSION

 For the reasons set forth above, the Court shall grant-in-part and deny-in-part Plaintiff's

Motion for Finding that Defendants and Their Prior Counsel, Stanley Goldschmidt, Esquire,

Attempted to Perpetrate a Fraud Against This Court and For an Award of Appropriate Sanctions,

and shall deny Mr. Goldschmidt's Motion for Sanctions Pursuant to Federal Rule of Civil

Procedure 11.  Moreover, the Court shall also deny as moot Defendants' Motion for Leave to File

Affidavit in Support of their Opposition to Plaintiff's Motion for Sanctions, and Plaintiff's

subsequent Motion to Strike Defendants' Affidavit.  Pursuant to this Court's finding of a

negligent violation of their discovery obligations in this case, Defendants and Mr. Goldschmidt

are jointly and severally liable for a fine of $5,000.00, payable to Plaintiff, that must be paid

before the start of trial in this case.  An Order setting out these rulings and the date of a status

conference to prepare for trial accompanies this Memorandum Opinion.

Date:   August 29, 2005


                              _____/s/_____
                              COLLEEN KOLLAR-KOTELLY
                              United States District Judge